IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Barbara Jean Sims, | ) | |
| | ) | Civil Action No. 6:12-3332-DCN-KFM |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on June 28, 2007, alleging that she became unable to work on December 31, 2004. The applications were denied initially and on reconsideration by the Social Security Administration. On December 26, 2007, the plaintiff

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and J. Adger Brown, an impartial vocational expert, appeared on August 24, 2009, considered the case *de novo*, and on December 18, 2009, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied review on March 22, 2010. On May 21, 2010, the plaintiff filed an action for judicial review (C.A. No. 6:10-1329-JFA-KFM). On December 28, 2010, the district court remanded the cause to the Commissioner for further administrative proceedings. Pursuant to the remand, the Appeals Council directed the ALJ to:

> – review additional post-hearing evidence; and. as warranted, obtain additional evidence concerning the claimant's mental impairments to complete the administrative record;
>
> – evaluate the claimant's mental impairments in accordance with the special technique described in 20 C.F.R. §§ 404.1520(a) and 416.920(a);
>
> – give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations, while also considering any treating and examining source opinions; and, if warranted,
>
> – obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base and determine whether the claimant has acquired any skills that are transferable to other occupations.

(Tr. 578).

On December 8, 2011, the ALJ held a *de novo* hearing at which the plaintiff and Rebecca Bruce, an impartial vocational expert, testified. On January 27, 2012, the ALJ denied the plaintiff's claim. On September 20, 2012, the Appeals Council denied the plaintiff's request for review, making the ALJ's decision final. On November 20, 2012, the plaintiff filed this action for judicial review.

2

In making her determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

(2)    It was previously found that the claimant is the unmarried widow of the deceased insured worker and has attained the age of 50.  The claimant met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act.

(3)    The prescribed period ends on June 30, 2014.

(4)    The claimant has not engaged in substantial gainful activity since December 31, 2004, the alleged onset date (20 C.F.R. §§ 404.1571 *et. seq.* and 416.971 *et seq.*).

(5)    The claimant has had the following severe impairments: borderline intellectual functioning; morbid obesity; iron deficiency anemia secondary to menorrhagia; non-insulin dependent diabetes mellitus; and hypertension with recurrent headaches (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

(6)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

(7)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except for the following limitations:  no lifting or carrying over 20 pounds occasionally and 10 pounds frequently; no more than occasional stooping, twisting, crouching, crawling, kneeling, and climbing of stairs or ramps; no balancing; no climbing of ladders, ropes, or scaffolds; avoidance of hazards such as unprotected heights, vibration, and dangerous machinery; an environment reasonably free from extremes of humidity and heat; only simple, routine, repetitive tasks; a low stress environment, defined as no rigid and inflexible production schedule, no complex decisions required of the claimant, and no required adaptation to frequent changes; and only occasional interaction with the general public.

3

(8)     The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(9)     The claimant was born on July 1, 1958, and was 46 years old, which is defined as an individual closely approaching advanced age,[3] on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(10)     The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(11)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(12)     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a) and 416.969(a)).

(13)     The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2004, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

---

[3]The regulations define a person of 46 years of age as a "younger person," rather than as a "person closely approaching advanced age." *See* 20 C.F.R. §§404.1563(c) and 416.963(c). However, this error does not appear to have had any bearing on the outcome of the plaintiff's claim and is not addressed by the parties.

has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

5

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**[4]

The plaintiff alleges disability commencing December 31, 2004, at which time she was 46 years old. She was 53 years old on the date of the ALJ's decision. She has past relevant work experience as a custodian, production worker, and sewing machine operator (Tr. 449).

---

[4]As the plaintiff's arguments focus on her mental functioning, the evidence discussed herein will do likewise.

On January 19, 2007, consultative examiner Edmund Gaines, Jr., M.D., performed a general comprehensive examination of the plaintiff (Tr. 289-92). Dr. Gaines reported that he was unable to find a significant physical abnormality that would render her unsuitable for any gainful employment. The plaintiff reported that she was taking no medications at that time (Tr. 289). The plaintiff's thought processes seemed normal, though her attention span was somewhat shortened. She spelled "world" forward and backward, and she counted back from 20. She could perform a simple cash transaction and was well oriented to time and place. Dr. Gaines noted, however, "[t]he severity of her anxiety disorder and the fact that it was addressed at her previous employer would make one wonder if a full psychological evaluation should not be obtained." Finally, he opined that the plaintiff could manage any funds awarded to her (Tr. 292).

On August 10, 2007, consultative examiner Mitchell Hegquist, M.D., examined the plaintiff and reviewed her medical history (Tr. 340-43). Dr. Hegquist noted that the plaintiff was alert and oriented, her thought process and behavior were within normal limits, her memory was intact, she could subtract $1.25 from $5.00, and she could perform "serial 3" subtractions. Dr. Hegquist stated that he "would question" the plaintiff's ability to manage her own financial funds. He also judged the plaintiff's intelligence to be in the "low normal" range (Tr. 343).

On January 31, 2007, Dr. Robbie Ronin reviewed the plaintiff's medical records and completed a Psychiatric Review Technique Form ("PRTF") assessing her condition from December 31, 2004, through January 30, 2007 (Tr. 294-307). Dr. Ronin assessed the plaintiff with non-severe mental impairments (Tr. 294). Dr. Ronin opined that the plaintiff had no limitation in activities of daily living; no limitation in maintaining social functioning; mild difficulty in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration (Tr. 304).

7

In a medical record dated on July 10, 2007, treating source Michael Bernardo, M.D., reported that the plaintiff visited the Newberry Family Health Center for the first time. With regard to her mental impairments, Dr. Bernardo noted that the plaintiff had been diagnosed with depression more than ten years ago.  The plaintiff also reported that her husband had passed away suddenly on June 27, 2007, she was not on any medication, and she presently felt a moderate degree of depression.  The plaintiff also denied any suicidal ideation (Tr. 338).  At the conclusion of the appointment, the doctor prescribed the medication Lexapro (Tr. 339).

On October 1, 2007, Debra Price, Ph.D., reviewed the plaintiff's medical records and completed a PRTF (Tr. 355-68).  Dr. Price assessed the plaintiff with non-severe mental impairments (Tr. 355).  Dr. Price opined that the plaintiff had a mild limitation in activities of daily living; a mild limitation in maintaining social functioning; mild difficulty in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration (Tr. 365).

On January 12, 2010, a provider at the Free Medical Clinic Newberry completed a disability questionnaire, in which the clinician stated that the plaintiff's mental impairments were mental retardation and anxiety.  The clinician noted that no medications had been prescribed for her conditions, nor had psychiatric care been recommended.  With regard to the plaintiff's mental status, the clinician noted that the plaintiff was oriented in all spheres; her thought process was slowed; her thought content was suspicious; her mood/affect was worried/anxious and depressed; and her attention, concentration, and memory were adequate.  Finally, the clinician opined that the plaintiff had a very serious work-related limitation due to her mental condition (Tr. 806).

On March 30, 2010, consultative examiner W. Russell Rowland, M.D., examined the plaintiff and conducted a disability evaluation (Tr. 813-17).  At this examination, the plaintiff identified anxiety and depression among her chief complaints (Tr.

8

813).  The plaintiff reported that she cried a lot for no reason.  She stated that she had been on antidepressants in the past, but her doctor had taken her off of them (Tr. 814).  Dr. Rowland noted that the plaintiff presented as pleasant with fair communication skills.  He further noted that she was oriented to the date, month, year, day, her location, and the name of the president.  The plaintiff was able to recall one of three objects after five minutes, spell the word "world" backward, subtract backward from 20 by threes, and understand cash transactions. Dr. Rowland further noted that the plaintiff reported that she finished high school and that she can read and write (Tr. 815).  Additionally, she reported that in order to have motivation she needed to push herself, but she also reported that her "concentration is okay" (Tr. 814).  Finally, Dr. Rowland opined that the plaintiff was not totally disabled, but that she would benefit from antidepressant medication (Tr. 817).

On January 26, 2010, Robert Phillips, Ph.D., a consultative examiner retained by the plaintiff's counsel, performed a psychological evaluation (Tr. 418-22).  Dr. Phillips administered the WAIS-III intelligence test, and he reported that the plaintiff obtained a verbal IQ score of 70, performance IQ score of 67, and a full-scale IQ score of 66 (Tr. 420).  Dr. Phillips also assigned the plaintiff a Global Assessment of Functioning ("GAF") score of 36[5] and opined that the plaintiff appeared very restricted in her ability to perform routine work in a normal setting.  Additionally, he opined that she could not handle her own funds at that time (Tr. 422).  At the evaluation, the plaintiff was aware of the date, place, and purpose of the assessment.  She was also able to repeat three words; however, she only recalled one of the three words after five minutes.  She was unable to complete serial seven subtractions, but she was able to subtract three from seven in her head.  Dr. Phillips also noted that the plaintiff had a fair memory for childhood events, but that her short term

---

[5]A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Diagnostic and Statistical Manual of Mental Disorders Text Revision* ("DSM IV") 34 (4th ed. 2000).

memory was not as good.  He observed that there were indications of a flat affect and mildly depressed mood.  Her thinking also indicated signs of confusion, perseveration, and negative expectation.  Furthermore, Dr. Phillips stated that her word choice was not age appropriate.  He also noted, however, that her speech was clear and nearly age appropriate (Tr. 419).

On May 31, 2011, Dr. Phillips performed a second evaluation (Tr. 896-99). At this evaluation, he administered the WAIS-IV intelligence test, and he reported that the plaintiff obtained a Verbal Comprehension Composite Score of 72, a Perceptual Reasoning Composite Score of 73, a Working Memory Composite score of 66, a Processing Speed Composite Score of 79, and a corresponding Full-Scale IQ score of 67 (Tr. 898-99).  In other testing, Dr. Phillips noted that the plaintiff scored in the normal range on the Folstein Mini-Mental Status Exam.  The plaintiff was generally oriented, she did not demonstrate any unusual psychiatric activity, her affect was within normal limits, and her short-term memory appeared to be fairly good.  The doctor also found that while the plaintiff's thought process appeared limited, her ability to concentrate was good, there were no indications of delusions or hallucinations, and she had no recent suicidal thoughts.  Additionally, he noted that she was able to attend well during the exam and, "[w]hile she has some problems with cognitive functioning[,] she should be able to focus during and complete simple tasks" (Tr. 897).  Finally, he opined that the plaintiff is not likely to need any help handling any funds that she might receive (Tr. 899).  He also assigned her a GAF score of 58[6] (Tr. 899).

In a Medical Source Statement (Mental), completed on June 12, 2011, Dr. Phillips opined that the plaintiff had a marked limitation in her ability to understand and remember complex instructions.  He also opined that her ability to understand, remember,

---

[6]  A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *DSM IV* at 34.

and carry out simple instructions was mildly to moderately impaired (Tr. 901), and that her ability to interact appropriately with the public, co-workers, and supervisors, and to respond appropriately to usual work situations and changes in routine work setting, was mildly impaired (Tr. 902).

Subsequent to Dr. Phillips' examinations, consultative examiner Ronald Thompson, Ph.D., conducted a psychological evaluation of the plaintiff on July 18, 2011 (Tr. 905-907). Dr. Thompson administered the WAIS-III test and reported that the plaintiff obtained a verbal IQ score of 68, a performance IQ score of 73, and a full-scale IQ score of 67 (Tr. 906). Dr. Thompson observed that the plaintiff's speech was coherent, although she was extraordinarily talkative in a loud voice and occasionally needed to be interrupted and redirected. He noted that her mood and affect were normal, she was oriented in all spheres, she knew the name of the President, and her thought process was linear and goal-directed. Moreover, her insight and judgment were adequate, her memory was intact, her cognitive spontaneity was within normal limits, and she appeared to function in the low average range (Tr. 905). Finally, Dr. Thompson opined:

> [The plaintiff] has an intellectual native capacity of low to mid borderline capability, but anxiety appears to be causing some diminished function below native intellectual capacity. However, it would appear that she could perform with pace and persistence in simple repetitive types of tasks, but in a busy and pressured latent work site, she probably would have some difficulty with concentration and performance. However, I do believe she would be capable of benefit management if they were awarded to her. Also, a mild antidepressant might help her anxiety problems.

(Tr. 906-907).

### Hearing Testimony

At the December 8, 2011, administrative hearing, the plaintiff testified that she completed the 12th grade and earned a high school diploma by attending summer school. She also testified that she was in regular classes, but that she was in the "slow group" (Tr.

11

468).  When asked about her reading ability, she stated that she could read some, but not all, of a newspaper (Tr. 468-69).  She also testified, however, that she was able to read the hearing notice letter that was sent to her and that she would be able to write a note to her attorney, if necessary (Tr. 469).  She also reported that she lived alone, shopped for her own groceries, and performed her own household chores (Tr. 467, 472-74).  Additionally, she denied undergoing any mental health treatment, including taking any prescription medication (Tr. 485-86).

A vocational expert also testified at the hearing (Tr. 488-93).  The vocational expert testified that, based on his review of the record, the plaintiff had past work at both the unskilled and semi-skilled levels (Tr. 489).  The ALJ asked the vocational expert to consider a hypothetical individual of the plaintiff's vocational profile, who could perform only simple, routine, repetitive tasks in a low stress environment with infrequent changes, no rigid and inflexible production schedule, and not requiring complex, complicated decisions; no ongoing interaction with the general public; no lifting and carrying over 20 pounds occasionally and 10 pounds frequently; no more than occasional stooping, twisting, crouching, crawling, kneeling, climbing stairs or ramps, or balancing; no climbing ladders, ropes, or scaffolds; had to avoid hazards such as unprotected heights, vibration, and dangerous machinery; had to avoid concentrated exposure to extremes of humidity or heat; and required an environment reasonably free from extremes of humidity and heat (Tr. 490-91).  In response, the vocational expert testified that the individual could not perform the plaintiff's past work, but could perform unskilled jobs that existed in significant numbers in the national economy such as laundry folder (1,525 in South Carolina and 380,400 nationally) or garment sorter (1,240 in South Carolina and 31,727 nationally) (Tr. 492).

## **ANALYSIS**

The plaintiff argues that the ALJ erred by (1) relying on an unqualified consultative examiner in determining that she is not disabled; and (2) failing to find that her impairments meet Listing 12.05.

### *Consultative Examiner's Opinion*

The plaintiff argues that "[s]ince he is not licensed as a Psychologist, Mr.[7] Thompson is not qualified to perform a 'Psychological Evaluation' and is not an acceptable medical source under [the Program Operations Manual System (""POMS")] section DI 22505.003(B)(1),"[8] and, therefore, the ALJ erred in relying on the consultative examiner's opinion (pl. brief at pp. 3-6). The plaintiff's own research and evidence in the record indicate that Dr. Thompson is not licensed as a psychologist in the State of South Carolina, but is licensed as a professional counselor (*see* pl. brief, attach.; Tr. 912-13).

Dr. Thompson examined the plaintiff on July 18, 2011. He administered the WAIS-III test and reported that the plaintiff obtained a verbal IQ score of 68, a performance IQ score of 73, and a full-scale IQ score of 67 (Tr. 906). Dr. Thompson observed that the plaintiff's speech was coherent, although she was extraordinarily talkative in a loud voice and occasionally needed to be interrupted and redirected. He noted that her mood and affect were normal, she was oriented in all spheres, she knew the name of the President, and her thought process was linear and goal-directed. Moreover, her insight and judgment were adequate, her memory was intact, her cognitive spontaneity was within normal limits, and she appeared to function in the low average range (Tr. 905). Finally, Dr. Thompson opined:

---

[7]The plaintiff refers to the consultative examiner as "Mr. Thompson" throughout her brief (*see* pl. brief at pp. 3-6). Dr. Thompson's signature block indicates that he holds a Ph.D. (Tr. 907). Accordingly, the undersigned will refer to him as "Dr. Thompson."

[8]POMS § DI 22505.003(B)(1) is derived from the regulations defining "acceptable medical sources" as set forth below. *See* https://secure.ssa.gov/apps10/poms.nsf/lnx/0422505003

13

> [The plaintiff] has an intellectual native capacity of low to mid borderline capability, but anxiety appears to be causing some diminished function below native intellectual capacity. However, it would appear that she could perform with pace and persistence in simple repetitive types of tasks, but in a busy and pressured latent work site, she probably would have some difficulty with concentration and performance. However, I do believe she would be capable of benefit management if they were awarded to her. Also, a mild antidepressant might help her anxiety problems.

(Tr. 906-907).

The ALJ cited Dr. Thompson's opinion in finding that the plaintiff did not meet a listing (Tr. 439) and gave Dr. Thompson's opinion "significant evidentiary weight" in making his residual functional capacity ("RFC") finding (Tr. 448). The plaintiff argues that this was in error (pl. brief at pp. 5-6).

The Commissioner's regulations require that consultative examiners be "qualified." 20 C.F.R. §§ 404.1519g, 416.919g. A qualified source is one that is currently licensed in the State and has the "training and experience to perform the type of examination or test we will request." *Id.* §§ 404.1519g(b), 416.919g(b). Here, while Dr. Thompson is not licensed as a psychologist in the state, he is licensed as a professional counselor, a marriage and family therapist, and as a professional counselor supervisor, and he holds a Ph.D (*see* pl. brief, attach.; *see also* Tr. 912-13). Based upon the foregoing, the plaintiff has failed to show that Dr. Thompson did not have the training and experience to perform her psychological evaluation.

The regulations define "acceptable medical sources" as:

(1) Licensed physicians (medical or osteopathic doctors);

(2) Licensed or certified psychologists. Included are school psychologists, or other licensed or certified individuals with other titles who perform the same function as a school psychologist in a school setting, for purposes of establishing intellectual disability, learning disabilities, and borderline intellectual functioning only;

14

(3) Licensed optometrists, for purposes of establishing visual disorders only . . . . ;

(4) Licensed podiatrists, for purposes of establishing impairments of the foot, or foot and ankle only . . . . ; and

(5) Qualified speech-language pathologists, for purposes of establishing speech or language impairments only. . . .

20 C.F.R. §§ 404.1513(a), 416.913(a).  While "[o]nly 'acceptable medical sources' can be considered treating sources, . . . whose medical opinions may be entitled to controlling weight," "[o]pinions from . . . medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 2006 WL 2329939, at *2-3.  The weight to be given to evidence from other medical sources "will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors . . . ."  *Id.* at *4.  "Opinions from 'other medical sources' may reflect the source's judgment about some of the same issues addressed in medical opinions from 'acceptable medical sources,' including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *5.  "[D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." *Id.*  The ALJ "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6.

15

Here, assuming that Dr. Thompson is not an "acceptable medical source" and is instead an "other medical source," the ALJ properly considered his opinion in accordance with SSR 06-03p. The ALJ weighed the evidence and explained his reasons for the weight given to all the medical opinions, including Dr. Thompson's opinion (Tr. 448-49). As will be discussed below, substantial evidence supports the ALJ's findings with regard to his step three listing analysis and his RFC finding.

**Listing 12.05**

The plaintiff argues that the ALJ erred in failing to find that she meets Listing 12.05(C) and (D). The regulations state that when a claimant shows that his impairment(s) meet or equal a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. §§ 404.1520(d), 416.920(d). To show that an impairment is "equivalent to a listed impairment, [a claimant] must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (citation and internal quotation marks omitted) (emphasis in original).

Listing 12.05 (Intellectual Disability)[9] provides as follows, in pertinent part:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> ***

---

[9] On August 1, 2013, while this appeal was pending, the Social Security Administration amended Listing 12.05 by replacing the words "mental retardation" with "intellectual disability." *See* 78 Fed.Reg. 46,499, 46,501 (to be codified at 20 C.F.R. pt. 404, subpt. P, app. 1). The change "does not affect the actual medical definition of the disorder or available programs or service." *Id*. at 46,500. While the parties have used the term "mental retardation" in their memoranda, the undersigned will use the term "intellectual disability" in this report.

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05.

As set forth above, to meet the diagnostic description or "capsule definition" of intellectual disability, an individual must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period [i.e., onset before age 22]." *Id.* This has been described by the Fourth Circuit Court of Appeals as "Prong 1" of Listing 12.05(C). *See Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012). "If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria [paragraphs A through D], we will find that [the] impairment meets the listing." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(A). " '[A]daptive functioning' refers to the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age. . . ." POMS § DI 24515.056(D)(2), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424515056.

The ALJ evaluated plaintiff's alleged intellectual disability at step three and concluded that Prong 1 of Listing 12.05 was not met because the evidence in the record

17

did not support a finding that she had the requisite deficits in adaptive functioning (Tr. 440). The ALJ cited as support for this finding, the plaintiff's wide range of "daily activities; her work history, which includes multiple jobs at the semi-skilled level; and her educational background, which includes completing high school without needing special education instruction" (*id.*).

With regard to the plaintiff's wide range of daily activities, the ALJ noted as follows:

> [The plaintiff] can complete an impressive spectrum of activities of daily living, including living alone and independently; shopping in stores for groceries and other sundries; tending to her personal care; preparing meals; completing household chores, such as cleaning, doing dishes, making a bed and doing laundry; taking out the trash; mopping the floor; vacuuming; cleaning the bathroom; driving alone; visiting with friends and family members; managing household bills; completing cash transactions; attending church; watching television; reading the bible; and reading the newspaper. . . . Furthermore, prior to his death, the claimant provided care for her disabled husband, including assisting with transferring him from bed to chair, dressing him, and bathing him . . . .

(Tr. 438). The daily activities identified by the ALJ were reported by the plaintiff in her testimony, the function report that she completed, and in oral reports to Drs. Gaines, Phillips, and Thompson (Tr. 188-92, 290, 419, 470-74, 897, 905-906). The plaintiff also testified that she earned her high school diploma (Tr. 468).

As for the ALJ's finding that the plaintiff's past work was inconsistent with an intellectual disability, two of the plaintiff's past jobs (production worker and sewing machine operator) were classified as semi-skilled jobs (Tr. 449, 489). Several courts have acknowledged the inconsistency between performing work at the semi-skilled level and an intellectual disability. *See Hines v. Astrue*, 317 F. App'x. 576, 579 (8th Cir. 2009) (finding that a "semi-skilled job [is] a job inconsistent with mental retardation."); *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (upholding the ALJ's determination that claimant's

impairments did not meet listing for mental retardation based in part on her previous successful work at a semi-skilled job). The plaintiff argues, without citation to any authority or further development, that her past relevant work "is consistent with a mental retardation level of functioning" (pl. brief at p. 7). The ALJ reasonably considered several factors, including her wide-ranging daily activities, her educational background, and her work history including semi-skilled work[10], in determining that she did not manifest the requisite deficit in adaptive functioning. *See Hancock*, 667 F.3d at 475–76 (concluding ALJ's finding that the claimant did not manifest requisite deficit in adaptive functioning to be supported by substantial evidence where the ALJ considered, among many other factors, that the claimant had worked several jobs). Based upon the foregoing, the undersigned finds that substantial evidence supports the ALJ's finding that the plaintiff did not meet Prong 1 of Listing 12.05.

**Residual Functional Capacity**

The ALJ found that the plaintiff had the RFC to perform light work with certain other limitations, including, as pertinent here, "only simple, routine, repetitive tasks; a low stress environment, defined as no rigid and inflexible production schedule, no complex decisions required of the plaintiff, and no required adaptation to frequent changes; and only occasional interaction with the general public" (Tr. 441). In determining that Dr. Thompson's examination report was entitled to significant evidentiary weight, the ALJ noted that Dr. Thompson's report was consistent with the overall evidentiary record and that the plaintiff's adaptive functioning was consistent with Dr. Thompson's finding (Tr. 448). The

---

[10]In *Luckey v. Dep't of Health and Human Servs.*, the Fourth Circuit Court of Appeals stated that the Commissioner "may not rely upon previous work history to prove non-disability where the section 12.05(C) criteria are met." 890 F.2d 666, 669 (4th Cir.1989) (citing *Murphy v. Bowen*, 810 F.2d 433, 438 (4th Cir. 1987) ("When a claimant for benefits satisfies the disability listings, benefits are due notwithstanding any prior efforts of the claimant to work despite the handicap."). However, here, the plaintiff's work history was only one factor considered by the ALJ in finding the plaintiff did not manifest the requisite deficits in adaptive functioning to satisfy Listing 12.05.

record shows that the plaintiff's educational background, daily activities, and work history are consistent with Dr. Thompson's findings and the RFC finding (Tr. 439). The plaintiff is a high school graduate who currently lives alone; she is able to shop for her own groceries, clothes, and household items (Tr. 467-68, 471, 481-82); she is able to drive by herself to go shopping and to attend doctor's appointments (Tr. 471, 481); and, prior to his sudden death in June 2007, the plaintiff was able to care for her disabled husband (Tr. 290, 467). Furthermore, examining sources Drs. Rowland and Gaines noted that she was able to spell the word "world" backward as well as count backward from 20 by ones and threes (Tr. 290, 815). They also noted that she is able to understand and complete simple financial transactions (Tr. 290, 815). Furthermore, at his most recent examination of the plaintiff, Dr. Phillips noted that the plaintiff was able to follow a simple direction, write a simple sentence, copy a geometric shape on paper, and read and complete a simple written task (Tr. 897). Moreover, he opined that "[w]hile she has some problems with cognitive functioning she should be able to focus during and complete simple tasks" (*id.*). Further, the plaintiff's history of semi-skilled work is also generally consistent with Dr. Thompson's opinion (Tr. 489).

The plaintiff argues that the ALJ "went to great lengths to discredit" the reports of Dr. Phillips (pl. brief at pp. 6, 9). The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5).

The ALJ considered the medical source opinions from Dr. Phillips and found that they were entitled to limited evidentiary weight for several reasons (Tr. 448). The ALJ noted that Dr. Phillips' reports were inconsistent with the record as a whole, in particular the plaintiff's "impressive adaptive abilities"; Dr. Phillips made conflicting findings in his two reports; the plaintiff made inconsistent statements to Dr. Phillips, which undermined the reliability of the evidence he used to generate his reports; and the plaintiff underwent her first examination by Dr. Phillips not in an attempt to seek treatment for symptoms, but rather through attorney referral (Tr. 447-48).

With regard to the consistency of Dr. Phillips' reports with the record as a whole, the ALJ discussed at length the plaintiff's activities of daily living, which are well supported by the plaintiff's own reports (Tr. 446; see Tr. 190-95, 290, 419, 438, 467, 471-74, 897, 905-906). Additionally, the plaintiff's treatment records show that she received regular treatment for a number of physical conditions (Tr. 448); however, with the exception of one episode of increased depression after her husband's sudden death, there is no indication that any of her various treatment providers treated her for a mental impairment, referred her for treatment, or expressed concern that she was not competent to attend to her own medical affairs (Tr. 333-39, 347-54, 399-416). Furthermore, as discussed previously, Drs. Gaines and Rowland found that the plaintiff was fully oriented and that she could engage in tasks that require concentration such counting backward, spelling "world" backward, and engaging in simple cash transactions (Tr. 290, 815). Dr. Hegquist opined that the plaintiff's intelligence was in the "low normal" range (Tr. 343). The ALJ gave these opinions "significant evidentiary weight" (Tr. 447).

Additionally, the ALJ's finding that the information that the plaintiff provided to Dr. Phillips, which ultimately formed part of the basis for his opinion, was not necessarily reliable is supported by substantial evidence. The ALJ noted that the plaintiff made inconsistent statements to Dr. Phillips between her two examinations and there were also

21

inconsistencies between her hearing testimony and her statements to Dr. Phillips (Tr. 447). For example, the plaintiff initially told Dr. Phillips that she had been in special education classes in high school (Tr. 418). At her second examination, however, she stated that she was in regular classes (Tr. 896). She also testified at the hearing that she was not in special education classes (Tr. 468). Additionally, she initially told Dr. Phillips that she was unable to learn in high school, but then she subsequently told him that she had average school abilities (Tr. 418, 896). As argued by the Commissioner, just as identifying and considering these inconsistencies is part of the credibility evaluation process that an ALJ is obligated to undertake when analyzing the credibility of a claimant, it follows that consistency in the plaintiff's statements to an examining source, who is relying on the claimant's statements, is also appropriate for consideration by an ALJ. *See generally* SSR 96–7p, 1996 WL 374186, at *5-6.

The ALJ's finding that Dr. Phillips' reports were inconsistent is also supported by the record (Tr. 448). Dr. Phillips initially concluded, in his January 26, 2010 report, that the plaintiff appeared very restricted in her ability to perform routine work in a normal work setting (Tr. 422). Dr. Phillips also concluded that the plaintiff could not manage her own finances, and he assessed the plaintiff with a GAF score of 36, indicating major impairment in several areas (*id.*). In his May 31, 2011, report, however, Dr. Phillips assessed the plaintiff with a GAF score of 58, indicating only moderate symptoms, just beyond the range of only mild symptoms (Tr. 899). Additionally, in his May 2011 report Dr. Phillips concluded the plaintiff was able to manage her own finances (*id.*).

The plaintiff argues that the ALJ impermissibly discredited Dr. Phillips' first report because it was commissioned by counsel (pl. brief at p. 6). The undersigned finds that the ALJ properly considered this as merely one factor in determining the weight to give Dr. Philips' opinion. "The court does not foreclose the possibility that whether a medical opinion is procured by attorney referral may sometimes be a factor in the weight given to

22

that opinion; however, that fact alone is insufficient to establish substantial evidence for discounting the [ ] opinion . . . ." *Jordan v. Colvin*, C.A. No. 8:12–cv–01676–DCN, 2013 WL 5317334, at *7 (D.S.C. Sept. 20, 2013) (citing *Hinton v. Massanari*, 13 F. App'x 819, 824 (10th Cir. 2001) (holding that an ALJ may "question a doctor's credibility" when the opinion was solicited by counsel but "may not automatically reject the opinion for that reason alone")). *See also McCummings v. Colvin*, C.A. No. 5:12-3315-TMC-KDW, 2014 WL 108356, at *13 (D.S.C. Jan. 10, 2014) (finding ALJ did not err in considering that doctor's opinion was solicited by counsel in combination with other factors in deciding to give the opinion less weight). Here, the ALJ did not limit the weight he gave to Dr. Phillips' report solely because it was obtained upon referral by the plaintiff's attorney (Tr. 448). Furthermore, Dr. Phillips' report could not have been entitled to controlling weight because he was not a treating source. Based upon the foregoing, the ALJ's decision to give limited weight to Dr. Phillips' opinions is supported by substantial evidence because it is based on a variety of considerations that are well documented in the record.

The plaintiff also argues that her inconsistent statements should be weighed in her favor because they are evidence of her low level of intellectual functioning (pl. brief at p. 6). The undersigned agrees with the Commissioner that the plaintiff's argument is properly characterized as a request for this court to reweigh the evidence and to substitute its judgment for that of the ALJ. When reviewing an ALJ's decision for substantial evidence, however, this Court cannot "reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).

The plaintiff also argues that when the ALJ cited a function report completed by her as one of the sources for his findings, he "chose to ignore an in-depth recounting of the manner in which Plaintiff completed this form and others . . . " (pl. brief at p. 7). The ALJ cited the function report (ex. 3E, Tr. 188-95) in his discussion of the plaintiff's daily

activities (Tr. 438).  The plaintiff does not dispute that the ALJ permissibly considered the function report; rather she believes the ALJ should have interpreted the report as favorable to her.  The plaintiff appears to argue that the ALJ should have found that her errors in grammar, spelling, and syntax warranted a detailed discussion by the ALJ and required the ALJ to weigh the manner in which she completed the function report in her favor (pl. brief at pp. 7-8).  The plaintiff does not provide any authority for this proposition.  As stated above, the standard of review is whether the ALJ's decision is supported by substantial evidence, and a reviewing court will not reweigh evidence or substitute its judgment for that of the ALJ. *Johnson*, 434 F.3d at 653.  As argued by the Commissioner, just as the plaintiff argues that the ALJ should have focused his attention on the grammar and syntax of the responses on the function report, she ignores the other evidence that may reasonably be gleaned from this report.  The report shows that the plaintiff remained capable of a number of activities, as noted by the ALJ in his decision (Tr. 438).  Moreover, the report could also be interpreted to reflect the plaintiff's ability to read and understand questions presented to her and fashion appropriate responses, notwithstanding any grammatical errors. (Tr. 188-95).  Here, the ALJ addressed the plaintiff's function report and considered it among numerous other pieces of evidence, including the opinions of Drs. Gaines, Hegquist, Rowland, and Thompson, as well as the State agency physicians, and the plaintiff's treatment records, reported daily activities, work history, and overall credibility (Tr. 441-49) in making his RFC finding. Collectively, this evidence constitutes substantial evidence.

Lastly, the plaintiff alleges that the ALJ erred by not discussing statements from medical sources regarding her mental deficits (pl. brief at pp. 9-10).  The plaintiff specifically notes that Dr. Gaines stated that "[t]he severity of her anxiety disorder and the fact that it was addressed at her previous employer would make one wonder if a full psychological evaluation should be obtained" (*id.* at p. 10 (citing Tr. 292)).  Additionally, the

plaintiff notes that Dr. Hegquist wrote "I would question her ability to manage her own financial funds" and "[f]urther further psychiatric evaluation suggested (*id.* (citing Tr. 343)).

The ALJ cited both reports repeatedly throughout his decision (Tr. 437, 443, 444, 446, 447). Furthermore, although the ALJ did not specifically discuss the language quoted by the plaintiff, the ALJ's decision is explicit in showing that he considered the reports. The ALJ stated as follows:

> As for the opinion evidence, first, the consultative examination reports of Dr. Gaines from January 19, 2007, Dr. Hegquist from August 10, 2007, and Dr. Rowland from March 30, 2010, show that the claimant has low average intellectual functioning, with largely normal mental status examinations, but they contain no indication of any mild mental retardation. . . . The overall medical evidence of record supports these conclusions. Moreover, the claimant's adaptive functioning including her activities of daily living, work history, and educational background support such findings. Therefore, I find that these reports are entitled to significant evidentiary weight.

(Tr. 447). An ALJ "is not required to discuss every finding in every medical report." *Pike v. Astrue*, No. 1:09CV448, 2011 WL 9300, at *5 (M.D.N.C. Jan. 3, 2011) (citing *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993)). Furthermore, consistent with the recommendation of both doctors, the plaintiff underwent three psychological evaluations after they issued their reports. Dr. Phillips examined the plaintiff twice, and Dr. Thompson examined her once (Tr. 418-22, 896-99, 905-907). Additionally, as discussed above, Drs. Ronin and Price completed PRTFs after Dr. Gaines and Hegquist had completed their respective examinations (Tr. 294-307, 355-368). Based upon the foregoing, this allegation of error is without merit.

## <u>CONCLUSION AND RECOMMENDATION</u>

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 29, 2014
Greenville, South Carolina